UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| D'OSSIE DEON DINGUS,<br><br>   Plaintiff,<br><br><br>vs.<br><br><br>TENNESSEE DEPARTMENT OF SAFETY, et al.,<br><br>   Defendants. | ORDER AND<br>MEMORANDUM DECISION<br><br><br><br>Nos. 3:07-cv-452 and 3:10-cv-435<br><br>(Campbell/Shirley) |

Plaintiff De'Ossie Dingus was hired by the Tennessee Public Service Commission as a commercial vehicle enforcement officer in July 2000. Later, in 2004, the Tennessee Public Service Commission merged into the Tennessee Department of Safety (TDOS), one of the Defendants in this case. At that time, Mr. Dingus automatically became a state trooper with the Tennessee Highway Patrol, a division of TDOS. Mr. Dingus' job responsibilities remained essentially the same after the merger.

Mr. Dingus is a Sunni Muslim. He is also an African American. He claims that from the beginning of his employment as a commercial vehicle enforcement officer in 2000 until he was terminated from his employment (for the second time) in 2010, he was discriminated against because of his race and religion. He filed this civil rights lawsuit against the TDOS and numerous individual Defendants, all of whom are associated with the TDOS.

Defendants have moved for summary judgment on all claims against all Defendants. The

court GRANTS Defendants' motion on Mr. Dingus' claim for racial discrimination[1] in violation

of Title VII and all claims against the individual Defendants under 42 U.S.C. § 1983.  But

because there are factual disputes which the trier of fact must resolve, the court DENIES

Defendants' motion on Mr. Dingus' claims against the TDOS for discrimination based on

religion and retaliation in violation of Title VII.

## I.  FACTUAL BACKGROUND

When Mr. Dingus began his employment as a commercial vehicle enforcement officer, he

attended sixteen weeks of training required by the Department of Safety.  He contends that

during training he "was harassed, and schemes were devised to humiliate [him] by other troopers

and instructors on the grounds of [his] religion."  (Dingus Aff. ¶9, Docket No. 128-1.)  Mr.

Dingus recounts, often without giving specific details, incidents of harassment including being

ridiculed for fasting, praying, reading the Quran, and being wrongly identified as a member of the

Nation of Islam.  He also claims that some of the students in his class did not want to sleep in the

same area as Mr. Dingus: "They said, Trooper Dingus doesn't like white people, his religion

preaches hate."  (Dingus Dep. 31:19-21, June 27, 2013.)  According to Mr. Dingus, another

Trooper told him,"[t]hey (the other troopers) don't think you like white people, and they don't

want to be in the same bay with you."  (Id. 32:7-9.)

Mr. Dingus maintains that the harassment continued as he carried out his duties working

at the West Knoxville weight scales.  According to Mr. Dingus, not only was he "ridiculed" for

---

[1]As the court will explain below, Mr. Dingus' claims of racial discrimination arise only in the context of his claims for religious discrimination.  In other words, he is referred to as a "black Muslim."  But this alone is not enough for a claim of racial discrimination.

praying, fasting and his dietary restrictions, but he "was constantly disciplined for alleged violations of general orders where other troopers were not disciplined at all." (Dingus Aff. ¶ 10.) Defendants point out that nineteen complaints were brought against Mr. Dingus from the beginning of his employment through May 2006. Ten of the nineteen complaints were sustained. But Mr. Dingus contends that the majority of the complaints were baseless and gives further examples of the Defendants' discriminatory actions.

Mr. Dingus gave an interview in 2005 to the Knoxville News Sentinel about his work as a trooper. The article quotes Mr. Dingus as saying, "I'm the same black person they (his fellow officers) fear." (Defs.' Mem. in Supp. Summ. J., Docket No. 100 at 3.) Mr. Dingus received a written reprimand for failing to inform his supervisors that he was giving the interview and for having an unauthorized photograph of the weigh scale (which was included with the interview) taken.

Captain James Bridgeman was the captain over the Commercial Vehicle Enforcement Unit while Mr. Dingus worked in the Unit. Captain Bridgeman, who was a Baptist minister, suggested that members of the unit take part in daily prayer. He "repeatedly" asked Mr. Dingus to join in the prayer group, although he knew Mr. Dingus was a Sunni Muslim. (Dingus Aff. ¶ 14.) When Mr. Dingus declined, Captain Bridgeman allegedly told him "that [his] employment with the Department would be greatly aided if [h]e would simply adhere to [Captain Bridgeman's] daily devotion/prayer meeting request and if [he] did not, then [his] employment with the Department would be difficult." (Id.) According to Mr. Dingus, in July 2004, Captain Bridgeman asked him to lead the prayer at lunchtime in front of seventy or eighty troopers. (Dingus Dep. 53:1-11, 92:5-12.)

3

<u>The 2006 Psychological Examination</u>

Following a eight-month medical leave in 2005, Mr. Dingus' supervisors required him to take a psychological examination. Mr. Dingus had previously taken, and passed, a psychological examination before he began work in 2000. Dr. Travis McNeal, a board certified psychologist, gave Mr. Dingus the examination in January 2006. Dr. McNeal concluded that Mr. Dingus was not fit to be a law enforcement officer. As a result, the TDOS terminated Mr. Dingus' employment in May 2006.

Mr. Dingus appealed his termination. Administrative law Judge Marion Wall heard his appeal. Judge Wall found that Dr. McNeal's examination was flawed and that Mr. Dingus "was, more likely than not, fit for duty." (Judge Wall's Initial Order, Ex. 11 to Defs.' Notice of Filing Exs. in Supp. of Mot. Summ. J. Docket No. 113-11 at 6.) Judge Wall ordered the TDOS to reinstate Mr. Dingus with full back pay and pay his attorney's fees.

The TDOS did not return Mr. Dingus to his previous position but instead, placed him in the driver's license division with the same pay and benefits. Mr. Dingus claims that this shows the TDOS' discriminatory intent.

<u>The Training Class</u>

On November 4, 2009, Mr. Dingus attended an in-service training class taught by Major Kevin Taylor, then military liaison to the TDOS. Rick Shipkowski, Deputy Security Advisor for the TDOS, was Major Taylor's supervisor. The subject of the lecture was to be weapons of mass destruction. During the class, Major Taylor played a video which Mr. Dingus contends, had "little or nothing to do with weapons of mass destruction." (Pl.'s Statement of Material Facts ¶ 46, Docket No. 131.) According to Mr. Dingus, the video "detailed the radicalization of three

4

young boys by their father at a Madrassa in Pakistan." (Id. ¶ 45.)  Mr. Dingus alleges that Major

Taylor also made numerous derogatory comments about members of the Islamic religion.

After class, Mr. Dingus and Major Taylor had a conversation.  What was said during the

conversation is disputed.  Mr. Dingus maintains that he "merely discussed the presentation with

Major Taylor in a civil tone . . . ." (Id. ¶ 56.)  Mr. Dingus states that Major Taylor said, "'Oh,

you're one of those.'  I said, 'One of what?'  He says 'You're a black Muslim." (Dingus Dep.

164:9-11.)

 Major Taylor's version of events was far different.  He described Mr. Dingus as being

disruptive during the presentation and angry and agitated during the conversation after class.

Four days later, Major Taylor wrote a memo to David Mitchell, Commissioner of the TDOS, in

which he expressed his belief that Mr. Dingus had the potential to be violent and should be

evaluated.  Based on Major Taylor's recommendation, Commissioner Mitchell ordered that Mr.

Dingus undergo a psychological examination.

Sergeant Ron Crockarell of the Office of Professional Responsibility did an internal

affairs investigation into what had happened during and after the training class.  He interviewed

the other 35 troopers who were in the class.  None of the troopers recalled seeing or hearing Mr.

Dingus behaving as Major Taylor had described, either during the class or after.

Sergeant Crockarell interviewed several people from the human resources department and

the driver's license division who worked with Mr. Dingus.  Sergeant Crockarell reported that all

of these individuals had positive things to say about Mr. Dingus and that he was "no trouble" and

"a good worker, pleasant, got along with other employees, and got along with the public."

(Internal Investigation Report, Ex. 23 to Pl.'s Opp'n to Defs.' Mot. Summ. J., Docket No. 128-23

5

at 12.)  Only Kerri Balthrop stated that Mr. Dingus was "argumentative," but that "he has not

done anything to put her in fear of physical harm."  (Id.)

Sergeant Crockarell also interviewed Major Taylor.  During the interview, Sergeant

Crockarell and Major Taylor discussed the conversation with Mr. Dingus and Major Taylor's

belief that Mr. Dingus could be dangerous:

> Taylor:        [W]hen he started talking about religion comes first before everything;
> before life itself and that, you know, you're not here to, uh, you're not put
> on the earth to, uh, uh, to please yourself, and that, that's not his exact
> words, but it was something to that effect.  You're not put on earth for
> yourself, you're put here to support Ali (sic) and, and he went on, you
> know, talking and . . . I'm trying to have a civil conversation with him and
> the more I were to say anything the madder he got and, and the more
> nervous he got.  And, uh, that reminded my eerily of, of the people that we
> took to Kabul . . . [Y]ou know, is this person a particular threat.  No, I
> don't think he's gonna go out and shoot somebody today but at some point
> somebody's gonna have a conversation with him.  Uh, I mean, the more
> we talked the madder he got, the more nervous he got, and somebody's not
> gonna be smart enough to let it go and let him calm down, uh, and if they
> push the issue, you, you can't push an issue like that with him because, uh,
> I have, I, I've just, I've seen that type of mentality before. . . . [H]e should
> be evaluated just to see, if, if, if this is interfering with his normal roles
> and responsibilities because I'll be honest, this is not the guy, from my
> experience, that I would want walking down the street carrying a weapon,
> uh, because if you were to push him over the edge can he separate, you
> know, job from what he feels his religious responsibility is and I'm not
> sure he can.

> Taylor:        . . . [A]n hour after this I was trying to get ahold (sic) of the Commissioner
> to talk to him about it.  And, uh, and I don't get scared all that often.  Uh,
> and I will say this, uh, within days, this was, uh on a, uh Wednesday, 2
> days later we had the Fort Hood incident, uh, and I was talking to the
> Commissioner prior to the Fort Hood incident, and now this is the, the
> same kind of caliber of guide, no probably not, uh, but it could be.  Uh
> absolutely.  I mean, if the right person pushed the right buttons with him,
> um, uh, because in his belief system, and this is, this is where, this is
> where when he's evaluated in his belief system, his life means nothing as
> long as it's in the pursuit of Ali (sic).  Uh, and in that case you will
> sacrifice anything, uh, or anybody, uh, to not violate what you believe is

> your, is your religious duty, uh, and that is almost the definition of
> fanaticism. Uh, I am not, believe me, I'm not against the Muslim, uh,
> religion or the Muslim, or the Islamic faith, but I, but I, I am worries about
> Islamic fundamentalist[s]. . . .

(Id. at 47-48.) Major Taylor also discussed his personal opinions on Muslims and stated that he

believed Mr. Dingus was not "a typical Muslim" because he believed that Mr. Dingus was

"pushing an agenda" similar to Muslim terrorists Major Taylor encountered in Afghanistan.

Major Taylor and Mr. Crockarell discussed Major Taylor's belief that Mr. Dingus exhibited "the

same aggressive characteristics" as "Muslim terrorists":

> Taylor: [Muslim terrorists] don't have any problem talking to you because they,
> they, and, and this is where the comparisons come in. They want you to
> understand why they're doing what they're doing . . . they want you to
> know that I'm doing this because it's part of my religious beliefs. . . . I'm
> not fighting, you know, a 1 year war. I'm fighting a 100 year war. And
> that's what you, as, as, as Christians and non-Muslims will never, never
> understand. And that's where the comparisons come in when I was talking
> to Trooper Dingus and he went into this thing about I'm not doing this for
> me. I'm, I'm and I don't care about the, you know, I, I am a Sooni (sic)
> Muslim. This is part of my religious beliefs. I'm doing this, uh, you
> know, I don't care about the Department of Safety. I don't care about you.
> I don't care about the people in this building. I work here. That's my job.
> But this is my belief. And that's the . . . The only people that I ever hear
> that coming out of that want to push that agenda so much were the people
> that we captured. . . . Yeah, [Muslims] didn't mind telling you, you know,
> that, what their beliefs were, but they never pushed an agenda that said this
> belief comes before me. It was always this is my duty and I'll do my duty.
> But they were . . . Even if they believed that that (sic) agenda came before
> them, they never verbally would push it. The only people that verbally
> pushed that outward bound agenda is those that had either committed an
> act or, or were in the process of committing an act. And that's, that's what
> scared me is that he was pushing this agenda and I was not a threat but he
> perceived me as a threat, which is why he was pushing the agenda and
> wanted, wanted me to know of his religious beliefs.
>
> . . .
>
> Crockarell: . . . what brought your concern for this letter, is that Trooper Dingus shows

the same characteristics as what you observed over there on, on the terrorist (sic).

Taylor:  The same aggressive characteristics. Yes.

Crockarell:  Okay. What about the, and I don't know a lot about the Muslim faith, what about, uh, uh, a (sic) guess a devote (sic) Muslim. What would their reaction be if they ran across other fates (sic), faiths like, I guess, what, what I'm thinking of is, what if Trooper Dingus is out there making a traffic stop and he gets a just devote (sic) Southern Baptist or Catholic and, how would he, could, would of, could, would it cause aggression to that person? I don't know.

Taylor:  Well, that, that, that is my question. That's why I think there needs to be more of a professional evaluation done because a typical Muslim will just ignore a Christian. Bottom line.

Crockarell:  Okay.

. . .

Taylor:  . . . [Typical Muslims] pretty much stick to their own world. They don't, don't want to know what's going on and if they hear about it, they just ignore and go on. But the ones that don't ignore, the ones that push, and going back to this agenda thing, the ones that push an agenda, there's, there's something more going on there and, and in his case what irritated him most about my brief was the fact that I mentioned that I was a Christian because he said it outside. . . . Not, it's not a typical Muslim response that, to, to automatically be aggressive because somebody was allowed to discuss Muslim issues in this type of setting.

. . .

Crockarell:  So what you're saying or what I'm getting is, he'd probably be okay until somebody attacked his Muslim faith or . . .

Taylor:  Correct. . . . As long as you're not discussing anything Muslim. I mean, he's not outwardly preaching, you know, his faith or anything when nothing else is going on. As long as nobody ever says anything about his faith or the Muslim faith in general that's a non-Muslim, he would probably always be fine, but as the likelihood of that happening now days is, that's not, you, you can't promise it.

8

Crockarell:     Well, I only know a couple of Muslims and both that, that I know are always, that's one of the first things they let everybody know, is right out front.  So it's a big chance he's gonna let people know too. . . .

(Id. at 58-62.)  During the interview, Sergeant Crockarell brought up the Fort Hood shootings with Major Taylor.  Major Taylor stated that he believed there had been several reports of the shooter's "aggressive tendencies" but that no one ever acted on them because "it is such a touchy issue because you're dealing with religious . . . partisanships that . . . typically nobody wants to get into."  (Id. at 65.)  Major Taylor went on:

> Nobody wants to, nobody wants to be the person that says "I've intruded upon you[r] religious beliefs."  . . . But there's a difference between religious beliefs and religious fanaticism and I'm not saying he's a fanatic.  What I'm saying is he has the potential. . . . [T]his guy has the potential to be approached by a fanaticest (sic).  Uh, this guy has the potential to be turned, uh, because he already has issues and problems that he feels with the Christian faith and, and that he also feels with the Department of Safety.  Cause he said it.  He already has issues with how he's being treated because of his faith.  If the right guy were to find that at (sic), and the right guy were to come along and push the buttons and say "Let me show you how to be a true Muslim," well, he's, he's the type of personality that, that could gravitate towards that in a heartbeat . . .

(Id.)  At the end of the interview, Major Taylor expressed his two "major concerns."

Taylor:         . . . The first major concern is, is will this guy lose his temper with the right person saying the wrong thing.  Uh, that, that's my first major concern, and my second concern is with his disgruntle (sic) belief system that he has right now.  Is there a possibility to be turned, uh, at a future date by, by somebody who, who is a terrorist.  And, uh, uh, I mean, and based on things that he's exhibited, those are 2 very viable concerns.  I'll put it this way.  If we were in Afghanistan and I had the same type, type of conversation with him, his name would of already been turned over to the intelligence agency to start taking a look at him, uh, because of what, what he displayed.  Again, that doesn't mean he's a bad person right now, uh, but he's, he's got some issues.

Crockarell:     And by saying that, which I don't know how in the world we, we would ever be able to deal with it, but he could, if he continues on like he is, the turning part that you're talking about could be a year from now, two years from now, three or . . .

| Taylor: | Or next week. |
|---|---|
| Crockarell: | Yeah.  Or next week.  So there's really, the potential is there and so you don't really have any way of knowing, I mean, I, my thought is he could pass a psychological now and then 6 months from now be turned.  It's hard . . .. |
| Taylor: | I don't . . . To be honest, my personal opinion, I don't believe he could pass a psychological right now with somebody with religious training. |
| | . . . |
| Blair: | . . . Well based upon that, I just have to ask though, if you think there's the potential that he could be turned by a terrorist? |
| Taylor: | Oh, yeah.  He would be a target that I would use right away. |

(Id. at 70-72.)

On January 7, 2010, Sergeant Crockarell finished his report.  In his report, Sergeant

Crockarell summarized Major Taylor's account of his interaction with Mr. Dingus.  At the end of

the sumamry, Sergeant Crockarell wrote that, "Major Taylor said Trooper Dingus exhibited some

of the same behavior that he has seen before when he was dealing with terrorist[s]."  (Id. at 11.)

Sergeant Crockarell concluded the report by stating that "[t]he Department of Safety was put in a

situation where it had to take action because of the memorandum written by Major Taylor.  The

ordered psychological evaluation of Trooper Dingus may have been an inconvenience for him,

but considering the responsibilities of the Department, the psychological evaluation does not

seem unreasonable."  (Id. at 13.)

The December 16, 2009 Psychological Examination

On December 16, 2009, Dr. Kenneth Anchor conducted the psychological examination of

Mr. Dingus that Commissioner Mitchell had ordered.  According to Mr. Dingus, Dr. Anchor

10

gave him only half of the psychological evaluation before telling him he could leave. Dr. Anchor concluded that, "[a]t this time, Mr. Dingus does not appear to be a satisfactory candidate to serve in the capacity of a law enforcement officer (i.e. State Trooper)." (Anchor Psychological Report, Docket No. 128-19 at 6.)

The 2010 Termination

On January 11, 2010, Colonel Mike Walker of the TDOS sent Mr. Dingus a memorandum telling him that he was recommending to Commissioner Mitchell that Mr. Dingus' employment be terminated. He gave the following reasons for the recommendation: the memorandum from Major Taylor about the November 4, 2009 training class, the nineteen complaints filed against Mr. Dingus between 2000 and 2006, and the conclusion of Dr. Anchor that Mr. Dingus was not a "suitable candidate" for law enforcement. Commissioner Mitchell followed the recommendation and Mr. Dingus' employment was terminated. (Walker Mem., Ex. 13 to Defs.' Notice of Filing Exs. in Supp. of Mot. Summ. J., Docket No. 113-13 at 3.)

In the termination documents that were sent to him, Mr. Dingus found a newspaper clipping entitled "Handling of Ft. Hood shooting suspect could bring discipline." (Fort Hood Article, Ex. D to Dingus Aff., Docket No. 128-1 at 20.) The article reports that several army officers were expecting to face disciplinary action for failing to recognize and discipline Major Nidal Malik Hasan, the United States Army psychiatrist and Medical Corps officer charged in the shootings at Fort Hood.

## II. PROCEDURAL BACKGROUND

Mr. Dingus has filed three separate complaints with the Equal Employment Opportunity Commission (EEOC): one on December 28, 2005, a second on June 21,2006, and the final

complaint on April 21, 2010. He has received right to sue letters for each complaint.

Mr. Dingus filed his first lawsuit on December 10, 2007 (Case No.3:07-cv-452). He alleged that the TDOS, the sole Defendant, had violated Title VII by discriminating against Mr. Dingus on the basis of race and religion. Mr. Dingus also brought a claim for retaliation against the TDOS. On March 31, 2009, Mr. Dingus filed an amended complaint adding four individual Defendants, all associated with the TDOS, and bringing claims under 42 U.S.C. § 1983.

Mr. Dingus brought a second lawsuit in October 2010 for retaliation and racial and religious discrimination (Case No. 3:10-cv-435). In this complaint, Mr. Dingus alleged violations of 42 U.S.C. § 1983 and 1985, Title VII and state law tort claims. The TDOS and several TDOS employees sued in their individual capacity were named as Defendants.

The two cases were consolidated, and the court ordered Mr. Dingus to file a Second Amended Complaint (the Complaint) in the consolidated case. The Complaint (Docket No. 83) alleges violations of §1983 and § 1985, Title VII, and state law tort claims. The TDOS, James R. Bridgeman, William Lay, Scott Shaver, Travis McNeal, Mike Walker, Rick Shipkowski, Kevin Taylor, John Savage, Betty Blair, Deborah Martin, Kerri Balthroup, and Tracy Trott are the named Defendants. The claims in the Complaint are the subject of the Defendants' motion for summary judgment.

In his opposition to Defendants' motion for summary judgment and at the hearing on October 28, 2013, Mr. Dingus agreed that several claims and several Defendants should be dismissed from the case. Mr. Dingus agreed that all claims based on Defendants' actions that

12

occurred more than 300 days before December 28, 2005,[2] when Mr. Dingus filed his first EEOC complaint, were barred by the time limitation of 42 U.S.C. § 2000e-5(e)(1).

Although the complaint itself does not clearly delineate the specific causes of action in each claim, the court concludes, based on the summary judgment memoranda and the arguments made during the October 28 Hearing, that Mr. Dingus is alleging the following: Violations of Title VII, 42 U.S.C. § 2000e-2(a), against the TDOS (claims 1, 3, 5) for racial and religious discrimination, and violations of 42 U.S.C. § 1983 against the individual Defendants Mike Walker, Betty Blair, Deborah Martin, Kerri Balthroup, and Tracy Trott, all in their individual capacities, for deprivation of Mr. Dingus' constitutional rights.

## III.  ANALYSIS

### A.    Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). See also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (summary judgment may be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."). A genuine issue of material fact exists when, after viewing the record and making all reasonable inferences in a light most favorable to the non-moving party, a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). The court views the factual evidence and draws reasonable inferences in favor of the non-moving

---

[2]300 days before December 28, 2005, is March 5, 2005.

party.  National Enters., Inc. v. Smith, 114 F.3d 561, 563 (6th Cir. 1997) (citing Matsushita Elec.

Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

The court then decides "whether the evidence presents sufficient disagreement to require

submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

Anderson, 477 U.S. at 251-52.  "The mere existence of a scintilla of evidence in support of the

plaintiff's position will be insufficient; there must be evidence on which the jury could

reasonably find for the plaintiff."  Id. at 252.

## B.    Title VII

Title VII of the Civil Rights act makes it unlawful for an employer to engage in

employment discrimination against any person because of that person's race, color, religion, sex,

or national origin.  42 U.S.C. § 2000e-2.  Mr. Dingus alleged that he "endured constant,

pervasive, and continuing harassment and discrimination based upon his race and religion since

the beginning of his tenure with Defendants and continuing throughout his employment."

(Complaint, Docket No. 83 at 5, ¶18.)   Mr. Dingus continued his allegations:

> Tennessee Department of Safety through its agents, took illegal adverse
> employment actions against Dingus, including unlawful, discriminatory,
> pretextual and inadequate return to duty in contravention of the Tennessee Civil
> Service Order, the coerced, involuntary custodial and pretextual psychological
> examination, administrative leave ultimately without pay, and, more importantly,
> termination in particular.

(Id. at 12, ¶ 37.)  The court concludes that Mr. Dingus was asserting claims under Title VII for

disparate treatment and hostile work environment in those allegations.

Mr. Dingus also brought a claim for retaliation, contending that TDOS's conduct

"demonstrate[s] a clear discriminatory animus against Dingus for taking for taking action and

14

reporting discrimination as set forth above . . . ." (Id. at 14, ¶ 39.)

The court will discuss each of Mr. Dingus's Title VII claims in turn.

Disparate Treatment

Under the burden-shifting framework for single-motive discrimination claims established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), the plaintiff bears the initial burden of persuasion in establishing a prima facie case of discrimination. When relying only on circumstantial evidence, the plaintiff must show: (1) he is a member of a protected class; (2) he was discharged; (3) he was qualified for the position held; and (4) he was replaced by someone outside of the protected class or was treated differently than similarly situated non-protected employees. Russell v. Univ. of Toledo, 537 F.3d 596, 604 (6th Cir. 2008).

Once the plaintiff makes this showing, the defendant employer must present a legitimate, nondiscriminatory reason for the discharge. Texas Dept. Of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-253 (1981); Chen v. Dow Chem. Co., 580 F.3d 394, 400 (6th Cir. 2009). The burden of production then shifts back to the plaintiff to show that the employer's proffered nondiscriminatory reason was pretext. Burdine, 450 U.S. at 252-253.

Mr. Dingus contends that the TDOS terminated his employment (twice) because of his race and religion.[3] The TDOS admits that Mr. Dingus is a member of protected classes due to his race and religion and that he was subject to adverse employment action. But the TDOS denies

---

[3]Mr. Dingus groups the two: "For the purposes of this Response and case, Plaintiff confines his claims to Defendants['] continuous discrimination of him pursuant to his religion (and race) as for the purpose of this case, Defendants have consistently referred to Plaintiff as a 'Black Muslim' and/or member of the Nation of Islam." (Pl.'s Resp. to Defs.' Mot. Summ. J., Docket No. 128 at 2, n.1.)

15

any discriminatory motive and asserts that it terminated Mr. Dingus' employment because the

psychological examinations showed that Mr. Dingus was not qualified to be a trooper.

conduct.[4]  Moreover, the TDOS argues that Mr. Dingus cannot show that he was treated

differently than other similarly situated employees as required by McConnell Douglas Corp. v.

Green, 411 U.S. 792.

Following the October 28, 2013 Hearing, the court directed the parties to submit

supplemental memoranda on the issue of whether Mr. Dingus was replaced by someone outside

of his protected class or whether he was treated differently than similarly situated, non-protected

employees.  In response to the court's order, Mr. Dingus asserted that he was not relying solely

on circumstantial evidence but rather, that he was relying on both direct and circumstantial

evidence.  For that reason, the court will evaluate the direct evidence, if any, tending to prove Mr.

Dingus' claim of disparate treatment.

As an example of direct evidence, Mr. Dingus contends that after Judge Wall ordered that

Mr. Dingus was "fit for duty" and should be reinstated, the TDOS "was not satisfied and directed

events (of which Mr. Dingus personally experienced) which ended up in a second termination . . .

. That incident and the subsequent events detailed by Mr. Dingus, clearly indicated

discriminatory intent by the Department to rid itself of Mr. Dingus' employment."  (Pl.'s Reply

to First Supplemental Br., Docket No. 144  at 3-4.)

The court agrees with Mr. Dingus that certain of the statements made by Major Taylor in

his interview with Sergeant Ron Crockarell, as described above, could be seen as evidence of

---

[4]Id.

16

Major Taylor's discriminatory belief that because of Mr. Dingus' religion, he posed a threat to the safety of others in the TDOS. Major Taylor's statements were reflected in the Minimum Due Process Memorandum sent by Colonel Mike Walker to Mr. Dingus: "Major Taylor has amassed a large amount of personal experience in dealing with violent individuals. Major Taylor stated that you showed some of the same behavioral characteristics that he has observed in his past interaction with terrorists." (Walker Mem., Ex. 13 to Defs.' Notice of Filing Exs. in Supp. of Mot. Summ. J., Docket No. 113-13 at 2.)

The following question by Sergeant Crockarell could be read to indicate a discriminatory belief toward Mr. Dingus because of Mr. Dingus' religion: "[W]hat if Trooper Dingus is out there making a traffic stop and he gets a just devote [sic] Southern Baptist or Catholic and, how would he, could, would of, could, would it cause aggression to that person? I don't know." (Internal Investigation Report, Ex. 23 to Pl.'s Opp'n to Defs.' Mot. Summ. J., Docket No. 128-23 at 59.) Sergeant Crockarell also stated: "[W]hat, I guess what I'm trying to get at is with your military training and your personal life experience with dealing with these people, what you're telling me . . . is that Trooper Dingus shows the same characteristics as what you observed over there, on, on the terrorist[s]." (Id.)

Major Taylor's description of the events was included in a memorandum that he sent to Commissioner Dave Mitchell: "I would like to reiterate my emergent concerns with Trooper Dingus' actions and my firm opinion that he has a potential for acting out in a violent manner within the workplace, if he viewed a challenge. I believe that Trooper Dingus poses a significant possible threat, and should be a candidate for a professional evaluation." (Taylor Mem., Ex. 3 to Defs.' Notice of Filing Exs. in Supp. of Mot. Summ. J., Docket No. 113-3 at 1.)

Based on this memorandum and Commissioner Mitchell's "confidence in Taylor's observations and opinions," Commissioner Mitchell ordered that Mr. Dingus undergo a psychological examination. (Mitchell Aff. ¶ 5, Docket No. 115.) Following the examination, Mr. Dingus' employment was terminated despite Mr. Dingus' denial of Major Taylor's version of events, a denial which appeared to be verified by the other troopers in the class.

Mr. Dingus claims that the article on the shootings at Fort Hood that was included in his termination documents is further evidence that the TDOS terminated his employment because of its belief that because Mr. Dingus was a Muslim, he was a threat to the safety of others.

"Direct evidence, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." Grizzell v. City of Columbus Div. of Police, 461 F.3d 711, 719 (6th Cir. 2006). When a plaintiff relies on direct evidence of discrimination, the burden-shifting framework of McDonnell Douglas does not apply. Chattman v. Toho Tenax Am., Inc., 686 F.3d 339, 346 (6th Cir. 2012). Rather, the burden falls on the Defendant to prove that it would have made the same decision without the discriminatory motive. Id. at 346-47. Moreover, "the burden of producing such evidence 'is not onerous and should preclude sending the case to the jury only where the record is devoid of evidence that could reasonably be construed to support the plaintiff's claim.'" Griffin v. Finkbeiner, 689 F.3d 584, 595 (6th Cir. 2012) (citing White v. Baxter Healthcare Corp., 533 F.3d 381, 400 (6th Cir. 2008)).

The TDOS contends that it terminated Mr. Dingus' employment for three reasons: (1) the Major Taylor incident; (2) Mr. Dingus' failure of the December 16, 2009 psychological examination; and (3) his disciplinary history. Mr. Dingus points to the following as evidence that the TDOS' stated reasons for his termination were pretextual: On February 2, 2009, Judge Wall

18

had found that Mr. Dingus was fit for duty; Mr. Dingus denied Major Taylor's version of the training class incident and notes that none of the troopers interviewed by Sergeant Crockarell support Major Taylor's story; before receiving the result of the psychological examination, Colonel Mike Walker had a draft termination of Mr. Dingus dated January 4, 2010; and finally, the article about the shooting at Fort Hood included in Mr. Dingus' termination documents.

The court concludes that the evidence produced by Mr. Dingus is sufficient to establish a prima facie case of discrimination and to rebut Defendants' stated reasons for termination. (Blair v. Henry Filters, Inc., 505 F.3d 517, 532 (6th Cir. 2007) ("[T]o survive summary judgment a plaintiff need only produce enough evidence to support a prima facie case and to rebut, but not to disprove, the defendant's proffered rationale.").

Hostile Work Environment

A hostile work environment is one that "is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) (internal citation omitted) (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65, 67 (1986)). Only conduct that is severe enough or pervasive enough "to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive" falls within Title VII's purview. Id. If the victim "does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment" and no Title VII violation has occurred. Id. at 21-22. Together, these objective and subjective elements require the environment to be reasonably perceived, and is perceived by the victim, as hostile or abusive. Id. at 22.

19

To determine whether a plaintiff has established an actionable hostile work environment, a court must look at the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23.

Regarding conduct that is beyond the time limits of the statute, the Court held that because "the incidents constituting a hostile work environment are part of one unlawful employment practice, the employer may be liable for all acts that are part of this single claim." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 118 (2002). **"In order for the charge to be timely, the employee need only file a charge within 180 or 300 days of any act that is part of the hostile work environment." Id. Here, so long as Mr. Dingus alleges an actionable charge that occurred on or after March 5, 2005, the court can consider conduct before that date which Mr. Dingus claims were part of the hostile work environment.

Mr. Dingus makes conclusory allegations that "from [the] inception of his employment, he was ridiculed and harassed because of the perceived beliefs of his religion." (Pl.'s Mem. Opp'n to Defs.' Mot. Summ. J., Docket No. 129 at 17.) Mr. Dingus continues: "In any event, the record reflects Plaintiff was continually harassed and subjected to multiple unfounded internal affairs investigations until he underwent a flawed fitness for duty psychological evaluation, which allegedly led to his May 22, 2006 termination." (Id.) He stated in his deposition that "[o]nce they found out I was Muslim, once I was deemed to be a hater of white people and didn't like being around them and I was with the Nation of Islam, it was like throwing sand out. You can sweep as much as you want, but you'll never get it up." (Dingus Dep. 37:18-22.)

20

In his deposition and affidavit, Mr. Dingus gives more detail about the alleged ridicule and harassment. He testified to the following examples: The instructors at the academy "made light" of the fact that he was fasting (Dingus Dep. 21:22); the instructors harassed him when he wanted to pray during the day; according to one of the troopers, some of the other students didn't want to sleep in the same dorm as Mr. Dingus; when he wrote a ticket for a violation, a sergeant or lieutenant would often void the ticket; he was not allowed to carry out investigations of accident scenes; and he was not allowed to drive a patrol car even when given permission by his supervisor, Sergeant Maffeo.

Mr. Dingus points to several incidents involving Captain Bridgeman as evidence of the hostile environment to which he was subjected. Captain Bridgeman allegedly told him, "Look, De'Ossie. I understand that you're a black Muslim and you're with the Nation of Islam and you don't like white people. And you got your coworkers up here feeling kind of funny about it, and they don't want to work with you." (Dingus Dep. 38:15-19.) Captain Bridgeman then told Mr. Dingus that he would watch out for him and "make sure they don't continue to harass you because of you don't like white people. That's your religion." (Dingus Dep. 39:5-7.)

Later, Captain Bridgeman asked Mr. Dingus to join him and the other troopers in morning prayer. When Mr. Dingus expressed his reluctance, Captain Bridgeman told him, "Well, this doesn't look good, that you're not in there praying with us. You're going to create a problem." (Dingus Dep. 50:7-9.) Mr. Dingus also alleges that Captain Bridgeman asked him to pray in front of seventy to eighty other troopers.

Mr. Dingus claimed that he was put in an isolated spot on the westbound side of the scales in Knoxville headed towards Nashville. Mr. Dingus testified, "There is very little contact

and it is almost impossible to get another officer over to the westbound side to either provide relief so you can take a department authorized break, or simply help out with the workload." (Dingus Aff. ¶ 11.)

Mr. Dingus contends that the internal affairs complaints he received lacked substance or were, for the most part motivated by his race and religion.

According to Mr. Dingus, the psychological examination he was required to take by Dr. McNeal in 2006 was not warranted because he had had two previous psychological examinations and the injury he had suffered in 2005 was "purely physical in nature." (Id. at 15.) The psychological examination in 2006 led to Mr. Dingus' first termination and the eventual reinstatement, pursuant to Judge Wall's order, of Mr. Dingus. Mr. Dingus claims that even after Judge Wall found that he was fit for duty and ordered that he be reinstated, the TDOS did not return him to his previous position but placed him in the driver's license division of the Department of Safety.

Because at least two of the incidents Mr. Dingus relies on, the psychological examination in 2006 and the subsequent placement of Mr. Dingus in the driver's license division happened after March 2005, the court can consider all incidents alleged by Mr. Dingus. And because Mr. Dingus has submitted sufficient evidence that a reasonable jury could conclude that he was subjected to a hostile work environment, the court denies Defendants' motion for summary judgment on that claim.

Retaliation

It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because [the

22

employee] has made a charge, testified, assisted, or participated in any manner in
an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). A retaliation claim can be established either through direct evidence of

retaliation or circumstantial evidence that would support an inference of retaliation. Spengler v.

Worthington Cylinders, 615 F.3d 481, 491 (6th Cir. 2010).

A plaintiff has the initial burden to establish a prima facie case of retaliation. To show

retaliation, the plaintiff must show that "(1) the plaintiff engaged in activity protected under Title

VII; (2) plaintiff's exercise of her protected rights was known to defendant; (3) an adverse

employment action was subsequently taken against the employee or the employee was subjected

to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal

connection between the protected activity and the adverse employment action or harassment."

Fuhr v. Hazel Park School Dist., 710 F.3d 668, 674 (6th Cir. 2013) (citing Garner v. Cuyahoga

Cnty. Juvenile Court, 554 F.3d 624, 639 (6th Cir. 2009)). Once the plaintiff has established a

prima facie case, a presumption of unlawful retaliation arises and the burden of production shifts

to the defendant to rebut the presumption by "articulat[ing] some legitimate, nondiscriminatory

reason for its actions." Id. (quoting Spengler, 615 F.3d at 492). If the defendant meets this

burden, the plaintiff must then demonstrate that the proffered reason was mere pretext for

discrimination by establishing that the proffered reason "1) has no basis in fact; 2) did not

actually motivate the adverse action; or 3) was insufficient to motivate the adverse action."

Abbott v. Crown Motor Co., Inc., 348 F.3d 537, 542 (6th Cir. 2003) (citing Manzer v. Diamond

Shamrock Chems. Co., 29 F.3d 1078, 1084 (6th Cir. 1994)).

Mr. Dingus has established the first three prongs of a prima facie case of unlawful

23

retaliation. In his complaint, Mr. Dingus alleges that the TDOS retaliated against him "for exercising his civil rights to charge and prosecute discrimination claims." (Complaint, Docket No. 83 at 10, ¶29.) Since 2005, Mr. Dingus has filed three separate charges of discrimination with the EEOC and the Tennessee Human Rights Commission. Title VII broadly protects an employee's participation "in any manner in an investigation, proceeding, or hearing under . . . [Title VII]." Id. (quoting 42 U.S.C. § 2000e-3(a)). The participation clause protects an employee's activities that "occur in conjunction with or after the filing of a formal charge with the EEOC." EEOC v. Total Sys. Serv., Inc., 221 F.3d 1171, 1174 n.2 (11th Cir. 2000).

The TDOS was aware of Mr. Dingus' EEOC and Tennessee Human Rights Commission charges and his two civil suits.

Mr. Dingus states that the TDOS took illegal adverse employment actions against him after he returned to work, which included "his return to work under discriminatory, embarrassing and humiliating conditions; not being placed back to his former job as a State Trooper; coerced, involuntary, custodial and pretexual psychological examination; placement on administrative leave ultimately without pay; and pretexual recommendation of termination from his employment for the safety of the service." (Second Amended Complaint, Docket No. 83 at 14.) See Hollins v. Atl. Co., Inc., 188 F.3d 652, 662 (6th Cir. 1999) ("[A] plaintiff must identify a materially adverse change in the terms and conditions of his employment to state a claim for retaliation under Title VII.").

The TDOS argues that Mr. Dingus cannot show that there was a causal connection between the protected activity and any adverse employment action. To establish a causal connection, the plaintiff must produce sufficient evidence "from which one could draw an

24

inference that the employer would not have taken the adverse action against the plaintiff had the plaintiff not engaged in activity that Title VII protects." Abbott, 348 F.3d at 543.

After Mr. Dingus was terminated on May 22, 2006, Mr. Dingus appealed his termination. Administrative law Judge Marion Wall heard his appeal. Judge Wall found that the TDOS had required Mr. Dingus to submit to, and pass, a psychological examination before he could return to work after his medical leave, but that "[t]his would not normally be required of a trooper who had been out on a worker compensation matter involving a bad back." (Judge Wall's Initial Order, Ex. 11 to Defs.' Notice of Filing Exs. in Supp. of Mot. Summ. J. Docket No. 113-11 at 2.) Judge Wall also found that part of Dr. McNeal's psychological evaluation involved speaking to people "who had dealt with" Mr. Dingus in his "hotly contested" worker compensation claim and referred Dr. McNeal to others who "had problems" with Mr. Dingus. (Id. at 3-4.) Judge Wall concluded that "[e]very evaluation [Mr. Dingus] has had, other than [Dr. McNeal's] has found problems, but has also found that [Mr. Dingus] is fit for duty" and that he should be reinstated. (Id. at 6-7.)

The TDOS has attempted to articulate legitimate, non-discriminatory reasons for terminating Mr. Dingus: the Mr. Taylor memorandum about the November 4, 2009 training class and the conclusion of Dr. Anchor that Mr. Dingus was not a "suitable candidate" for law enforcement.

The TDOS states that "TDOS personnel had no reason to believe that Taylor's opinions regarding Plaintiff following the November 4, 2009, incident were not genuine." (Defs.' Mem. in Supp. Summ. J., Docket No. 100 at 30) (emphasis added.) But this proffered reason has no basis in fact. Mr. Dingus' testimony and parts of Sergeant Crockarell's report dispute the Taylor

25

memorandum. Sergeant Crockarell interviewed Mr. Dingus and the thirty-something other troopers that were in attendance at Mr. Taylor's presentation and not one witnessed the events as reported by Mr. Taylor. Sergeant Crockarell also interviewed other fellow employees of Mr. Dingus and nearly all gave positive reviews of Mr. Dingus. Sergeant Crockarell's conclusion at the end of the report relied solely on Mr. Taylor's interview and memorandum despite the contrary evidence.

As additional evidence of pretext, Mr. Dingus submitted a draft copy of Colonel Walker's memorandum recommending that Mr. Dingus be terminated. The draft memorandum, dated January 4, 2010, stated that Mr. Dingus should be terminated based upon the results and information obtained during the internal affairs investigation. But Sergeant Crockarell did not finish the investigation and report until, at the very earliest, January 7, 2010. (See Internal Investigation Report, Ex. 23 to Pl.'s Opp'n to Defs.' Mot. Summ. J., Docket No. 128-23 at 9.)

Dr. Anchor's report appeared to rely a great deal on the Taylor memorandum and Dr. McNeal's Psychological Fitness for Duty Evaluation from 2006, the same psychological report that Judge Wall concluded was flawed. Judge Wall found it "noteworthy that Dr. McNeal was not furnished documents from Captain Bridgeman and Sergeant Shaver commending [Mr. Dingus'] work performance" and that Dr. McNeal "did not know that some of the items in his file regarding hostile or threatening behavior came from people involved in the [contested] worker compensation matter." (Judge Wall Initial Order, Ex. 11 to Defs.' Notice of Filing Exs. in Supp. of Mot. Summ. J., Docket No. 113-11 at 4.) But the main defect that Judge Wall found in Dr. McNeal's report was that Mr. Dingus was "told he had to take and pass a psychological examination before he would be allowed to return to work" and was therefore "trying to 'pass'

26

the test." (Id.)  Dr. Anchor's report suffers from these same problems.  Dr. Anchor relied only on the materials provided to him by the TDOS, including the Taylor memorandum and the deficient Dr. McNeal report.  And Mr. Dingus knew that he needed to pass the test in order to keep his job.

Still, the TDOS claims that it relied on Dr. Anchor's report in deciding to terminate Mr. Dingus.  An employer's reason for taking an adverse action may be bad or mistaken, so long as it is not unlawful.  See Pollard v. Rea Magnet Wire Co., Inc., 824 F.2d 557, 559 (7th Cir. 1987).

Mr. Dingus claims that this proffered reason is pretextual because the TDOS had already made the decision to terminate Mr. Dingus even before the psychological report had been completed.  On December 22, 2009, Deborah Martin, the EEOC coordinator and civil service prosecutor for the TDOS, sent an email to John Savage and Kerri Balthrop that stated: "As soon as the psychological report is received, Greg is prepared to meet with us regarding the due process.  Just let me know when the report is received and I'll set up the meeting."  (Martin Email, Ex. 20 to Pl.'s Opp'n to Defs.' Mot. Summ. J., Docket No. 128-20 at 1.)  The court agrees with Mr. Dingus that the TDOS' reliance on Dr. Anchor's finding that Mr. Dingus was not fit for duty could be seen as pretextual.

Finally, the court declines to grant summary judgment on Mr. Dingus' discrimination and retaliation claims because the TDOS' true motivations are "particularly difficult to ascertain" at this stage.  Singfield v. Akron Metro. Hous. Auth., 389 F.3d 555, 564 (6th Cir. 2004).  Several courts have urged caution in granting summary judgment once the plaintiff has established a prima facie case.  See id.  ("[S]ummary judgment for the defendant will ordinarily not be appropriate on any ground relating to the merits because the crux of a Title VII dispute is the 'elusive factual question of intentional discrimination.'"); see also Sweat v. Miller Brewing Co.,

27

708 F.2d 655, 657 (11th Cir. 1983); McKenzie v. Sawyer, 684 F.2d 62, 67 (D.C. Cir. 1982) (factual disputes in most Title VII cases preclude summary judgment). The court finds that TDOS' true reasons for placing Mr. Dingus in the drivers' license division and for his termination present factual questions incapable of resolution on summary judgment.

**C.      42 U.S.C. § 1983**

To determine whether a defendant is entitled to qualified immunity, the Sixth Circuit Court of Appeals typically uses a two-step analysis: (1) considering the evidence in the light most favorable to the plaintiff, has the plaintiff shown that a constitutional right has been violated, and (2) was that right clearly established. Miller v. Admin. Office of the Courts, 448 F.3d 887, 893 (6th Cir. 2006) (internal citations omitted). At times, the court must add a third step: has the plaintiff offered enough evidence to show that what the defendant did was objectively unreasonable in light of clearly established constitutional rights. Id. Once the defense of qualified immunity is raised, the plaintiff has the burden to demonstrate that the defendant is not entitled to qualified immunity. Id. at 894 (quoting Silberstein v. City of Dayton, 440 F.3d 306, 311 (6th Cir. 2006)).

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier v. Katz, 533 U.S. 194, 201 (2001). Here, the court must look primarily to the law of this circuit and to that of the Supreme Court. Perez v. Oakland County, 466 F.3d 416, 427 (6th Cir. 2007).

For a right to be clearly established, a case need not have the same facts as another, or even "materially similar" facts. Id. The controlling question is whether a defendant had "fair

28

warning" that his actions were unconstitutional. Id. "The right allegedly violated cannot be asserted at a high level of generality, but, instead, 'must have been 'clearly established' in a more particularized, and hence more relevant sense, . . . .'" Gean v. Hattaway, 330 F.3d 758, 767 (6th Cir. 2003) (quoting Anderson v. Creighton, 483 U.S. 635, 639-40 (1987)). "Because most legal rights are 'clearly established' at some level of generality, qualified immunity would be impossible to obtain if a plaintiff were required only to cite an abstract legal principle that an official had 'clearly' violated." Martin v. Heideman, 106 F.3d 1308, 1312 (6th Cir. 1997).

Mr. Dingus claimed that six state actors are individually liable for violating Mr. Dingus' constitutional rights. The Defendants raised the defense of qualified immunity. Even after a careful reading of the second amended complaint, Mr. Dingus' opposition memorandum to Defendants' motion for summary judgment (see Docket No. 129), and the transcript of the October 28, 2013 Hearing (see Docket No. 137), the court was "unable to discern which specific constitutional right or rights Mr. Dingus is alleging each specific Defendant had violated." (July 1, 2014 Order, Docket No. 145 at 1.) The court directed that Mr. Dingus file a supplemental memorandum identifying the specific right or rights violated "pointing to the evidence in the record (giving all necessary identifying information) that supports his contention. He must also cite to case law which demonstrates that the particular right or rights were well-established." (Id.) The Defendants were given the right to file an opposition to Mr. Dingus' memorandum.

In response to the order, Mr. Dingus filed a second supplemental memorandum (see Docket No. 153). This memorandum gives only an abbreviated, generalized description of the alleged unconstitutional conduct of each of the six Defendants. The court will not repeat the descriptions here. But none of them provides sufficient detail to allow the court to decide if the

29

conduct of any of the Defendants was unconstitutional. The claims center upon the Defendants' initiating the process that culminated in the psychological examination of Mr. Dingus on December 16, 2009, and Mr. Dingus' second termination of employment. Mr. Dingus alleges that these actions violated Mr. Dingus' "right under the Fourteenth Amendment to be free from racial discrimination, Plaintiff's Fourteenth Amendment right to Equal Protect, and Plaintiff's First Amendment rights to free speech and religious exercise . . . ." (Id. at 1.)

Mr. Dingus relies only on cases and law that stand for generalized propositions. For example: "It cannot be disputed that the United States Constitution protects Plaintiff against racial discrimination, religious discrimination, and unequal treatment at the hands of his public employer. See Daniels v. Bd. of Educ. of Ravenna City Sch. Dist., 805 F.2d 203, 207 (6th Cir. 1986). See also U.S. Const. Amend. I, Amend. XIV." (Id. at 4.) This is not sufficient.

Even if Mr. Dingus had provided sufficient evidence to show that the Defendants had violated one or more of his constitutional rights, which he did not, he still failed to show that any of the rights alleged was clearly established so as to give a reasonable person in Defendants' position fair warning that what they were doing, in this particular case, was unconstitutional.

## IV. ORDER

Accordingly, the court GRANTS Defendants' motion for summary judgment on Mr. Dingus' claims against the TDOS for racial discrimination in violation of Title VII and all claims against the individual Defendants brought under 42 U.S.C. § 1983. The court DENIES Defendants' motion for summary judgment on all of Mr. Dingus' claims against the TDOS for retaliation and religious discrimination in violation of Title VII. A trial will be set for November 17, 2014.

DATED this 17th day of September 2014.


                                        BY THE COURT:

                                        *Tena Campbell*

                                        TENA CAMPBELL
                                        United States District Judge