UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| DE'OSSIE DEON DINGUS,<br><br>                    Plaintiff,<br><br>vs.<br><br>TENNESSEE DEPARTMENT OF SAFETY,<br>et al.,<br><br>                    Defendants. | FINDINGS OF FACT AND<br><br>CONCLUSIONS OF LAW<br><br><br><br>Case Nos. 3:07-CV-452, 3:10-CV-435<br><br>(Campbell/Shirley) |

Plaintiff De'Ossie Dingus is a Sunni Muslim. He is also an African American. For ten years he was an employee of Defendant Tennessee Department of Safety (the TDOS).[1] His employment with the TDOS was terminated (for a second time) in 2010. Mr. Dingus brought this civil rights lawsuit claiming that the TDOS terminated his employment because of his religion and that throughout his employment, he was the victim of discrimination.[2]

A trial was held before the court in November 2014. Based on its consideration of all the evidence and the relevant law, the court concludes that Mr. Dingus has not proved that he was subjected to a hostile work environment or that the TDOS retaliated against him. But the court concludes that Mr. Dingus did prove that the TDOS discriminated against him because of his

---

[1] The Tennessee Public Service Commission hired Mr. Dingus as a commercial vehicle enforcement officer in 2000. In 2004, the Tennessee Public Service Commission merged into the TDOS and Mr. Dingus automatically became a state trooper with the Tennessee Highway Patrol. Throughout this decision, the court will refer to both entities as the TDOS.

[2] The court discussed at length the procedural history of this case in its summary judgment order (Dkt. No. 156).

religion. Mr. Dingus has not, however, established that he is entitled to any damages other than nominal damages.

## FINDINGS OF FACT

Before being hired as a commercial vehicle enforcement officer, Mr. Dingus was interviewed and tested by Dr. Michael Bottari. Dr. Bottari concluded that Mr. Dingus did "not possess the psychological characteristics deemed necessary to perform the duties of the position sought and is <u>not</u> considered to be psychologically suited to that position for reasons detailed in this report." (Apr. 25, 2000 Bottari Report, Ex. 28C at 18 (emphasis in original).) Despite this report, the TDOS hired Mr. Dingus.

<u>The Initial Training Program</u>

When Mr. Dingus began working as a commercial vehicle enforcement officer, he attended sixteen weeks of training required by the TDOS. At trial, when Mr. Dingus was asked to describe his experience during training, he responded:

> Well, to say the least, it was a little trying. I ran into problems right off the bat with being called a black Muslim. I ran into problems with being associated with the Nation of Islam. I ran into problems when it was, when it was time to pray. I would ask could I do that. I was told, no. My dietary needs, that was an issue.

(Nov. 17, 2014 Transcript of Bench Trial (Tr.) (Dkt. No. 189) at 22.)

He further testified that the term "black Muslim" is associated with the Nation of Islam. According to Mr. Dingus, who is a Sunni Muslim:

> The Nation of Islam has an extreme hatred for white people. The Nation of Islam has an extreme hatred for America itself. Under the Sunni Islam under the religion of the prophet Muhammad we follow the 122 Sunnahs of the prophet. It is a far cry and a deep division between the two. They are not associated with and as far as the Sunnies [*sic*] are concerned we don't have a hang up with anybody in terms of color or religion or such as that.

2

(Id. at 28.)

Mr. Dingus testified that, during training, his "roommates said that they did not want to bunk with me because I was with the Nation of Islam and that I had these issues with white people." (Id. at 29.) Later, Mr. Dingus' sergeant called Mr. Dingus into his office and asked him about being with the Nation of Islam. Mr. Dingus "tried to explain to them then that I was not with the Nation of Islam. That I followed a practice under Sunnism." (Id.) Mr. Dingus was told not "to allow my religion to cause a hostile environment with my roommates." (Id. at 29-30.)

The West Knoxville Weight Scales

Mr. Dingus testified that the duties of a commercial vehicle enforcement officer were "essentially" the same as a highway patrol officer although a highway patrol officer received additional training in accident reconstruction. (Id. at 17.) Similar to officers with the highway patrol, commercial vehicle enforcement officers were commissioned officers who were issued weapons, handguns, mace or pepper spray, and a baton. They also were issued handcuffs.

The first day Mr. Dingus reported for duty after having completed training, he was "written up" (received a disciplinary report) for having a pocket knife with a three-inch blade clipped to the side of his pants pocket. (Id. at 33.) But, according to Mr. Dingus:

> Most troopers carry pocket knives and when we were in the academy it was common practice to see troopers or CVE guys down there. One of the reasons a lot of people carry pocket knives, if you go to an accident and you have a seat belt and can't get it, they'll cut the seat belt and things of that nature, if they are going to extract you from the vehicle. I had a pocket knife and they wrote me up for insubordination for having a pocket knife.

(Id. at 33.)

For the majority of his time as a commercial vehicle enforcement officer, Mr. Dingus was

3

stationed at the westbound side of the highway weigh station in the Knoxville area. Most of the other officers were assigned to work on the eastbound side. He testified that he usually worked alone on the westbound side. One of Mr. Dingus' commanding officers told him that he was assigned to the westbound side because he "made the other officers feel uncomfortable." (Id. at 36.)

Captain James Bridgeman was Mr. Dingus' supervisor. Captain Bridgeman, a Baptist minister, held prayer meetings in his office for those working under his supervision. Captain Bridgeman asked Mr. Dingus to join the prayer group. Mr Dingus testified: "He asked me to come in and pray with the rest of the troopers and I told him that I didn't want to do that. He said that I should because it would make the other officers feel comfortable, as though I was a part of the team, so to speak." (Id. at 39.)

Captain Bridgeman also asked Mr. Dingus, in front of the other officers (approximately 75 officers), to lead the prayer meeting. Mr. Dingus refused.

Mr. Dingus described a conversation he had with Captain Bridgeman shortly thereafter. "He didn't say anything that day, but the following day or so we were back at work he said, well, you missed an opportunity to show that you were part of the, that you liked white people [Captain Bridgeman is African-American], that you didn't have an issue with people." (Id. at 40.)

During the years Mr. Dingus worked as a commercial vehicle enforcement officer, he received performance evaluations. Mr. Dingus testified that he was evaluated as either superior (a "5" on the written evaluation) or exceptional (a "4"). (The evaluations were received into evidence as Exhibit 31.) Although Mr. Dingus' signature appears on each of the evaluations, he

4

denied signing the two evaluations dated 2004-2005. (Id. at 45-46.)

Mr. Dingus was the subject of nineteen Internal Affairs complaints while he was a commercial vehicle enforcement officer. (See Ex. 32 (list of the complaints).) Of the nineteen complaints, nine were sustained, six were not sustained, three were described as "unfounded," and the final complaint was still pending when the list was compiled. (See id.)

The 2006 Psychological Examination

Following a nine-month medical leave in 2005, Mr. Dingus' supervisors required him to take a psychological examination. Dr. Travis McNeal found that Mr. Dingus was not fit for duty. As a result, the TDOS terminated Mr. Dingus' employment.

Mr. Dingus appealed his termination. After an evidentiary hearing, Administrative Judge Marion P. Wall found that Dr. McNeal's methodology in administering the test was seriously flawed and the test invalid. (See Feb. 2, 2009 Order by Tenn. Civ. Serv. Comm'n Admin. J. Marion P. Wall, Ex. 4.) He ordered that Mr. Dingus "should be reinstated with back pay, attorney's fees, restoration of leave balances, and otherwise made whole[.]'" (Id. at 1.)

The TDOS appealed Judge Wall's order to the Tennessee Civil Service Commission. The Commission upheld Judge Wall's order. The TDOS Commissioner, David Mitchell, then requested that the Tennessee Attorney General's Office prosecute an appeal to the Chancery Court. The Attorney General's office declined and Judge Wall's order stood.

Reinstatement at the Driver License Service Center

In July 2009, the TDOS reinstated Mr. Dingus to full employment. However, Mr. Dingus did not return to his previous position as a commercial vehicle enforcement officer. The TDOS sent Mr. Dingus a letter notifying Mr. Dingus of his reinstatement to a new position:

5

> You will be temporarily assigned non-law enforcement duties until all
> qualifications, certifications, training updates and fitness-for-duty evaluations
> have been successfully completed. These requirements must be met prior to
> resuming enforcement duties for safety purposes. During this re-training period
> you will report in a non-enforcement capacity, wearing civilian/business attire,
> you may not carry a weapon; you must commute in your own personal vehicle and
> will not be allowed to ride with any commissioned officer during approved
> fitness-for-duty assignment. You are not allowed to drive a State vehicle,
> administer Road Tests nor will you have any supervisory duties. The Department
> of Safety will expedite your return to enforcement duties as soon as possible;
> however, this process and re-training period could be lengthy. We know you are
> eager to return to enforcement duties and will assist you in any way possible so
> that you may again protect and serve the citizens of Tennessee with
> Professionalism, Integrity and Pride.

(Letter from Dave Mitchell, TDOS Comm'r, to De'Ossie Dingus (July 27, 2009), Ex. 8.)

Mr. Dingus' supervisors at the Driver License Service Center described Mr. Dingus as a good worker, pleasant with other staff members and the public. (See Tr. at 201-03.)

The Training Class

In November 2009, Mr. Dingus attended an in-service training class taught by Major Kevin Taylor who was then a military liaison to the TDOS. The training was part of a five-day program held in Nashville, Tennessee. The subject of the class was weapons of mass destruction. During the class, Major Taylor played a video titled <u>The Karachi Boys</u>. (See Ex. 30 (containing link to video on YouTube).) Mr. Dingus described the video: "The video talks about how the father kidnaps his sons and takes his sons from the United States to Karachi and over a period of time he begins to indoctrinate them and began to radicalize them to extreme Islamic thoughts of hating America and training them to become terrorists." (Tr. at 61.)

After class, Mr. Dingus spoke with Major Taylor. According to Mr. Dingus,

> I expressed to him that I thought that the information he put out was prejudice.
> [*sic*] I asked him why would he give a lecture on women being raped, the hygiene

6

> of the men, them being nasty how they use the restrooms in the street, asked him why would he put that information out to people that had not had a real familiarity with people who were Islamic and that I thought it set up a bad taste in people's mouths about how they would deal with people who were Islamic when they came across them.
>
> Q.   Was your voice raised at all?
>
> A.   No.
>
> Q.   Did Major Taylor have any response to you?
>
> A.   He seemed to be a little agitated behind it. He asked me why, he asked me why I was asking. I told him because I was Muslim. Then he, as coincidental as it may seem, he also said to me, "so you are one of those." I asked him "one of what?" He said, "You are one of those black Muslims. I said, well, "I am Muslim." He said, "well, have you been overseas to study?" I said, "I have never been overseas." He said, "Well, you know, if you have got a problem with the way that I have given out this information, why don't you contact me and let's sit down and talk about it." I said, "No, I don't need to contact you. I just wanted to let you know that I thought that the material that you put out was bad."

(Id. at 65-66.)

Major Taylor's version of events[3] was far different. He described Mr. Dingus as being disruptive during the presentation and angry and agitated after class. He wrote a memorandum to Commissioner Mitchell stating that he believed that Mr. Dingus "may lose control and do something violent." (Case Summary, written by Sgt. Ron Crockarell to TDOS case file, Ex. 27, at 12 (Jan. 7, 2010) (paraphrasing Major Taylor's letter to Comm'r Mitchell).) Major Taylor told the Commissioner that Mr. Dingus should receive a psychological evaluation.

Based on Major Taylor's memorandum, Commissioner Mitchell ordered that Mr. Dingus have a psychological evaluation. Commissioner Mitchell did not speak to Mr. Dingus before he

---

[3]Major Taylor has since died.

7

ordered the evaluation.

### Sergeant Crockarell's Investigation

Sergeant Ron Crockarell of the Office of Professional Responsibility was directed to investigate the events during and after the training class. Following his investigation, he prepared a report of his findings. (See Case File for OPR Case No. AD20090132, Ex. 27.) He interviewed the thirty-five people who attended the class with Mr. Dingus. None of them saw or heard Mr. Dingus act in the way Major Taylor had described. No one remembered anyone being disruptive in class or any kind of problem during or after the class.

Sergeant Crockarell and Captain Betty Blair interviewed Major Taylor on December 21, 2009. Major Taylor's statements to Sergeant Crockarell and Captain Blair during the interview clearly show that Major Taylor believed that Mr. Dingus, because of his religious beliefs, was dangerous:

> [W]hen he started talking about religion comes first before everything; before life itself and that, you know, you're not here to, uh, you're not put on the earth to, uh, uh, to please yourself, and that, that's not his exact words, but it was something to that effect. You're not put on earth for yourself, you're put here to support Ali [*sic*] and, and he went on, you know, talking and . . . I'm trying to have a civil quiet conversation with him and the more I were to say anything the madder he got and, and the more nervous he got. And, uh, that reminded me eerily of, of the people that we took to Kabul . . . . [Y]ou know, is this person a particular threat. No, I don't think he's gonna go out and shoot somebody today but at some point somebody's gonna have a conversation with him. Uh, I mean, the more we talked the madder he got, the more nervous he got, and somebody's not gonna be smart enough to let it go and let him calm down, uh, and if they push the issue, you, you can't push an issue like that with him because, uh, I have, I, I've just, I've seen that type of mentality before. . . . [H]e should be evaluated just to see, if, if, if this is interfering with his normal roles and responsibilities because I'll be honest, this is not the guy, from my experience, that I would want walking down the street carrying a weapon, uh, because if you were to push him over the edge can he separate, you know, job from what he feels his religious responsibility is and I'm not sure he can.

8

> . . . . [A]n hour after this I was trying to get ahold [*sic*] of the Commissioner to talk to him about it. And, uh, and I don't get scared all that often. Uh, and I will say this, uh, within days, this was, uh on a, uh Wednesday, 2 days later we had the Fort Hood incident, uh, and I was talking to the Commissioner prior to the Fort Hood incident, and now this is the, the same kind of caliber of guide, no probably not, uh, but could it be. [*sic*] Uh absolutely. I mean, if the right person pushed the right buttons with him, um, uh, because in his belief system, and this is, this is where, this is where when he's evaluated in his belief system, his life means nothing as long as it's in the pursuit of Ali [*sic*]. Uh, and in that case you will sacrifice anything, uh, or anybody, uh, to not violate what you believe is your, is your religious duty, uh, and that is almost the definition of fanaticism. Uh, I am not, believe me, I'm not against the Muslim, uh, religion or the Muslim, or the Islamic faith, but I, but I, I am worried about Islamic fundamentalist[s]. . . .

(Tr. of Dec. 21, 2009 Interview of Major Kevin Taylor, Ex. 27, at 47-48.)

Major Taylor also discussed his personal opinions on Muslims and stated that he believed Mr. Dingus was not "a typical Muslim" because he believed that Mr. Dingus was "pushing an agenda" similar to Muslim terrorists whom Major Taylor encountered in Afghanistan. Major Taylor and Mr. Crockarell discussed Major Taylor's belief that Mr. Dingus exhibited "the same aggressive characteristics" as "Muslim terrorists":

> Taylor: [Muslim terrorists] don't have any problem talking to you because they, they, and, and this is where the comparisons come in. They want you to understand why they're doing what they're doing . . . they want you to know that I'm doing this because it's part of my religious beliefs. . . . I'm not fighting, you know, a 1 year war. I'm fighting a 100 year war. And that's what you, as, as, as Christians and non-Muslims will never, never understand. And that's where the comparisons come in when I was talking to Trooper Dingus and he went into this thing about I'm not doing this for me. I'm, I'm and I don't care about the, you know, I, I am a Sooni [*sic*] Muslim. This is part of my religious beliefs. I'm doing this, uh, you know, I don't care about the Department of Safety. I don't care about you. I don't care about the people in this building. I work here. That's my job. But this is my belief. And that's the . . . The only people that I ever hear that coming out of that want to push that agenda so much were the people that we captured. . . . Yeah, [Muslims] didn't mind telling you, you know, that, what their

9

beliefs were, but they never pushed an agenda that said this belief comes before me. It was always this is my duty and I'll do my duty. But they were . . . Even if they believed that that agenda came before them, they never verbally would push it. The only people that verbally pushed that outward bound agenda is those [*sic*] that had either committed an act or, or were in the process of committing an act. And that's, that's what scared me is that he was pushing this agenda and I was not a threat but he perceived me as a threat, which is why he was pushing the agenda and wanted, wanted me to know of his religious beliefs. . . .

Crockarell: . . . what brought your concern for this letter, is that Trooper Dingus shows the same characteristics as what you observed over there on, on the terrorist [*sic*].

Taylor: The same aggressive characteristics. Yes.

Crockarell: Okay. What about the, and I don't know a lot about the Muslim faith, what about, uh, uh, a [*sic*] guess a devote [*sic*] Muslim. What would their reaction be if they ran across other fates [*sic*], faiths like, I guess, what, what I'm thinking of is, what if Trooper Dingus is out there making a traffic stop and he gets a just devote [*sic*] Southern Baptist or Catholic and, how would he, could, would of, could, would it cause aggression to that person? I don't know.

Taylor: Well, that, that, that is my question. That's why I think there needs to be more of a professional evaluation done because a typical Muslim will just ignore a Christian. Bottom line.

Crockarell: Okay. . . .

Taylor: . . . [Typical Muslims] pretty much stick to their own world. They don't, don't want to know what's going on and if they hear about it, they just ignore and go on. But the ones that don't ignore, the ones that push, and going back to this agenda thing, the ones that push an agenda, there's, there's something more going on there and, and in his case what irritated him most about my brief was the fact that I mentioned that I was a Christian because he said it outside. . . .

Not, it's not a typical Muslim response that, to, to automatically be aggressive because somebody was allowed to discuss Muslim issues in this type of setting. . . .

10

> Crockarell: So what you're saying or what I'm getting is, he'd probably be okay until somebody attacked his Muslim faith or . . .
>
> Taylor: Correct. . . . As long as you're not discussing anything Muslim. I mean, he's not outwardly preaching, you know, his faith or anything when nothing else is going on. As long as nobody ever says anything about his faith or the Muslim faith in general that's a non-Muslim, he would probably always be fine, but as the likelihood of that happening now days is, that's not, you, you can't promise it.
>
> Crockarell: Well, I only know a couple of Muslims and both that, that I know are always, that's one of the first things they let everybody know, is right out front. So it's a big chance he's gonna let people know too. . . .

(Id. at 58-62.) During the interview, Sergeant Crockarell brought up the Fort Hood shootings[4] with Major Taylor. Major Taylor stated that he believed there had been several reports of the shooter's "aggressive tendencies" but that no one ever acted on them because "it is such a touchy issue because you're dealing with religious . . . partisanships that . . . typically nobody wants to get into." (Id. at 65.) Major Taylor went on:

> Nobody wants to, nobody wants to be the person that says "I've intruded upon you[r] religious beliefs." . . . But there's a difference between religious beliefs and religious fanaticism and I'm not saying he's a fanatic. What I'm saying is he has the potential. . . . [T]his guy has the potential to be approached by a fanaticest [sic]. Uh, this guy has the potential to be turned, uh, because he already has issues and problems that he feels with the Christian faith and, and that he also feels with the Department of Safety. Cause he said it. He already has issues with how he's being treated because of his faith. If the right guy were to find that at [sic], and the right guy were to come along and push the buttons and say "Let me show you how

---

[4] In November 2009, an army psychiatrist opened fire at the Fort Hood Army base in Texas, killing at least twelve people and wounding more than thirty others. According to a 2010 Los Angeles Times article, "Between five and eight Army officers are expected to face discipline for failing to take action against the accused Ft. Hood shooter, Maj. Nidal Malik Hasan, over a series of behavioral and professional problems in the years leading up to the November rampage." (Ex. D to Aff. of De'Ossie Dingus.)

11

to be a true Muslim," well, he's, he's the type of personality that, that could gravitate towards that in a heartbeat . . . .

(Id.) At the end of the interview, Major Taylor expressed his two "major concerns."

Taylor: . . .The first major concern is, is will this guy lose his temper with the right person saying the wrong thing. Uh, that, that's my first major concern, and my second concern is with his disgruntle [*sic*] belief system that he has right now. Is he a possibility to be turned, uh, at a future date by, by somebody who, who is a terrorist. And, uh, uh, I mean, and based on things that he's exhibited, those are 2 very viable concerns. I'll put it this way. If we were in Afghanistan and I had the same type, type of conversation with him, his name would of already been turned over to the intelligence agency to start taking a look at him, uh, because of what, what he displayed. Again, that doesn't mean he's a bad person right now, uh, but he's, he's got some issues.

Crockarell: And by saying that, which I don't know how in the world we, we would ever be able to deal with it, but he could, if he continues on like he is, the turning part that you're talking about could be a year from now, two years from now, three or . . .

Taylor: Or next week.

Crockarell: Yeah. Or next week. So there's really, the potential is there and so you don't really have any way of knowing, I mean, I, my thought is he could pass a psychological now and then 6 months from now be turned. It's hard . . . .

Taylor: I don't . . . . To be honest, my personal opinion, I don't believe he could pass a psychological [*sic*] right now with somebody with religious training. . . .

Blair: Well based upon that, I just have to ask though, if you think there's the potential that he could be turned by a terrorist?

Taylor: Oh, yeah. He would be a target that I would use right away.

(Id. at 70-72.)

Several of Mr. Dingus co-workers at the Driver License Service Center spoke to Sergeant

12

Crockarell. Their comments about Mr. Dingus were positive, primarily that he was a good worker, pleasant and got along with the public. (Tr. at 200-203.)

Sergeant Crockarell did not interview Mr. Dingus.

The 2009 Psychological Evaluation

On December 16, 2009,[5] Mr. Dingus was taken by two officers from the TDOS to Nashville to the office of Dr. Kenneth Anchor for a psychological evaluation. Among the documents given to Dr. Anchor for use in preparing his report were the memo from Major Taylor and the 2006 psychological examination which Judge Wall had found to be invalid. Dr. Anchor concluded that Mr. Dingus was not fit for duty. (See Ex. 21.) But Dr. Anchor included the following warning in his report:

> Importantly, this evaluation is in large part based on information provided by the applicant [the TDOS]. It would be important to know if that information contained inaccuracies, or misrepresentations. If your agency determines that this information was inaccurate, the evaluating psychologist should be contacted. The effect of more accurate or complete information could change the psychological recommendation. These findings are time limited and should not be considered to meaningfully and constructively extend beyond a period of more than six months.

(Id. at 6.)

Not only did the TDOS fail to tell Dr. Anchor that a judge had found the 2006 psychological examination invalid, but the TDOS never informed Dr. Anchor that none of the other thirty-five troopers who had attended the training class saw or heard the events Major Taylor had recounted.

---

[5]Mr. Dingus remembers the date as December 14 but the report of the examination, Exhibit 21, bears the date of December 16.

13

The 2010 Termination

On January 8, 2010, Lieutenant Colonel T.G. Trott sent a recommendation to Colonel Mike Walker that Mr. Dingus' employment be terminated:

> I have reviewed the OPR summary of Major Taylor's complaint. We as leaders in the department have a duty to provide a safe work atmosphere. Major Taylor's assertion that could [*sic*]Trooper Dingus could react violently in the workplace if challenged certainly was enough cause to have him evaluated. Dr. Anchor's conclusion was that Trooper Dingus was not a satisfactory candidate for a law enforcement officer gives us no choice but to terminate his employment. That is my recommendation.

(Ex. 24.) On January 11, 2010, Colonel Mike Walker of the TDOS sent Mr. Dingus a memorandum telling him that he was recommending to Commissioner Mitchell that Mr. Dingus' employment be terminated. (Ex. 23 at 8.)

Commissioner Mitchell terminated Mr. Dingus' employment with the TDOS. In the termination memorandum he sent to Mr. Dingus, Commissioner Mitchell cited the alleged incident with Major Taylor and Dr. Anchor's report finding Mr. Dingus unfit for duty. (Ex. 35.)

When Mr. Dingus was given his termination documents, he found stapled to the documents a newspaper article with the headline: "Handling of Ft. Hood shooting suspect could bring discipline." (Ex. D to Ex. 28.) The article outlined the alleged failures of the accused Ft. Hood gunman's supervisors to take "corrective action" when he failed to meet "basic officer standard." (Id.; see also Tr. at 76-78, 117-20.)

Damages

Mr. Dingus testified that he felt isolated and "disheartened" because of the actions of the TDOS. He did not provide any more details about the emotional and psychological effects he suffered. He testified that he lost his salary after his terminations. He relied on his salary to pay

14

his bills and expenses. Mr. Dingus did not give any details or specific facts about these financial losses. (See Tr. at 81-82.)

## **CONCLUSIONS OF LAW**

Mr. Dingus' three remaining claims fall under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. He contends that because of his religion, the TDOS terminated his employment; that he was subjected to a hostile work environment; and that when he successfully contested his first termination, the TDOS retaliated against him. As discussed below, the court concludes that Mr. Dingus has proved that the TDOS terminated his employment because of his religion but Mr. Dingus has not proved that he was subjected to a hostile work environment or that the TDOS retaliated against him for contesting his first termination.

The 2010 Termination

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e-2(a)(1). An employer becomes liable under Title VII when the plaintiff "establish[es] 'that the defendant had a discriminatory intent or motive' for taking a job related action." Ricci v. DeStefano, 557 U.S. 557, 577 (2009) (quoting Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 985-86 (1988)). "The plaintiff may show this discriminatory intent through the use of either direct or circumstantial evidence." Chattman v. Toho Tenax Am., Inc., 686 F.3d 339, 346 (6th Cir. 2012). Mr. Dingus has produced sufficient direct evidence to establish that the TDOS terminated his employment because he is a Sunni Muslim.

15

Major Taylor's discriminatory belief that because of Mr. Dingus' religion, he posed a threat to the safety of others in the TDOS is made abundantly clear by his statements to Sergeant Crockarell. Major Taylor also communicated his beliefs in his memorandum that he sent to Commissioner Dave Mitchell: "I would like to reiterate my emergent concerns with Trooper Dingus' actions and my firm opinion that he has a potential for acting out in a violent manner within the workplace, if he viewed a challenge. I believe that Trooper Dingus poses a significant possible threat, and should be a candidate for a professional evaluation." (Taylor Nov. 8, 2009 Mem. (see Defs.' Notice of Filing Exs. in Supp. of Mot. Summ. J. (Dkt. No. 113-3)) at 1.) Moreover, Major Taylor's statements were reflected in the Minimum Due Process Memorandum sent by Colonel Mike Walker to Mr. Dingus: "Major Taylor has amassed a large amount of personal experience in dealing with violent individuals. Major Taylor stated that you showed some of the same behavioral characteristics that he has observed in his past interaction with terrorists." (Walker Jan. 11, 2010 Mem. (see Defs.' Notice of Filing Exs. in Supp. of Mot. Summ. J. (Dkt. No. 113-13)) at 2.) Based on this memorandum and Commissioner Mitchell's confidence in Taylor, Commissioner Mitchell ordered that Mr. Dingus undergo a psychological examination.

The TDOS gave Dr. Anchor the results of Mr. Dingus' 2006 psychological examination (which a judge had declared invalid) and Major Taylor's memorandum. The TDOS did not tell Dr. Anchor that no one else in the training class had seen or heard what Major Taylor reported. And even with this one-sided record, it was clear to the court that Dr. Anchor was far from definite about his conclusion:

Importantly, this evaluation is in large part based on information provided by the

16

applicant [the TDOS]. It would be important to know if that information
contained inaccuracies, or misrepresentations. If your agency determines that this
information was inaccurate, the evaluating psychologist should be contacted. The
effect of more accurate or complete information could change the psychological
recommendation.

(Ex. 21 at 6.)

Despite Dr. Anchor's disclaimer warning and the TDOS' knowledge that the materials it gave Dr. Anchor were misleading, at best, and despite the fact that no one in the training class verified Major Taylor's claims, the TDOS terminated Mr. Dingus' employment. In effect, the TDOS was, in the courts view all too eager to accept Major Taylor's belief that because Mr. Dingus was a Muslim, he was dangerous. And the Fort Hood incident, which took place at approximately the same time, appeared to strengthen not only Major Taylor's belief that Mr. Dingus was a threat because he was a Muslim but the belief of the TDOS. The fact that the newspaper article describing the Fort Hood shooting to the documents was stapled to Mr. Dingus' termination documents clearly illustrates the unlawful link between the decision to terminate Mr. Dingus' employment and Mr. Dingus' religion.

Retaliation

Under Title VII an employer may not discriminate against a person "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). The TDOS does not contest that Mr. Dingus engaged in the following protected conduct: filing charges of discrimination with the EEOC and the Tennessee Human Rights Commission; and successfully contesting his 2006 termination. Nor does the TDOS dispute that Mr. Dingus suffered an

17

adverse employment action when the TDOS terminated his employment again in 2010. The TDOS claims, though, that it terminated Mr. Dingus because of Dr. Anchor's evaluation. The court has already discussed why the TDOS' claimed reliance on Dr. Anchor's evaluation simply is not worthy of belief. And the court has already discussed why it finds that the TDOS terminated Mr. Dingus' employment because of Mr. Dingus' religion. The issue now is what role, if any, did Mr. Dingus' protected activity play in the TDOS' decision.

After careful review of the evidence, the court concludes that although Mr. Dingus' protected activity certainly did not endear him to the TDOS, it was not a factor in the TDOS' decision. From the beginning of Mr. Dingus' employment, many in the TDOS did not accept Mr. Dingus because of his religion. For example, Mr. Dingus' roommates at the initial training program said that they didn't want to bunk with him because he was a Muslim; Sergeant Bridgeman told Mr. Dingus that maybe if he joined the prayer group, other troopers would like him; the TDOS isolated Mr. Dingus at the west Knoxville weight scales; and the TDOS' opposition to accepting Judge Wall's decision that Mr. Dingus was fit for duty. All this showed the court that the TDOS wanted to get rid of Mr. Dingus because of his religion long before he successfully challenged his 2006 termination.

Hostile Work Environment

A hostile work environment is one that "is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment . . . ." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (citations omitted). "But Title VII comes into play before the harassing conduct leads to a nervous breakdown. A discriminatorily abusive work environment, even one

18

that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers." (Id. at 22.)

Although the Court recognized that no "mathematically precise test" exists, it gave the following guidance for determining whether an environment is sufficiently abusive or hostile to violate Title VII:

> [W]e can say that whether an environment is "hostile or "abusive" can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required.

(Id. at 23.)

Here, the actual discriminatory conduct was not frequent, and it was not physically threatening (although, clearly, Mr. Dingus found it humiliating). Throughout his employment, Mr. Dingus' work performance was excellent. The most offensive name Mr. Dingus was called was "Black Muslim." When the court uses the United States Supreme Court's direction in evaluating Mr. Dingus' claim, the court concludes that Mr. Dingus has not shown that he endured a hostile work environment.

Damages

Mr. Dingus testified that he lost salary and benefits when he was terminated. He gave no details or specific amounts. On his claim for emotional distress, mental anguish, and loss of enjoyment of life, his testimony was that "it is disheartening and it hasn't been an easy thing."

19

(Tr. at 81.) But in his Proposed Findings of Fact and Conclusions of Law, Mr. Dingus maintains, without disclosing a basis for his contention, that he is entitled to $300,000 for "emotional distress and mental anguish," "for loss of enjoyment of life," and "inconvenience." (Dkt. No. 196, ¶¶ 252, 254, 255.) He also claims, without citation to any evidence received at trial, that the TDOS "wrongly withheld $2,241.33 in health insurance premiums" and he is entitled to receive that as damages. (Id. ¶ 257.) Finally, he seeks "injunctive relief removing all discriminatory actions and conduct from his personnel record at the Tennessee Department of Safety." (Id. ¶ 249.) But Mr. Dingus has given no details about the specific entries he wants removed from his personnel record.

The court is mindful that it has broad discretion to award damages and fashion remedies under Title VII. And the court recognizes that Mr. Dingus was not required to submit evidence of the monetary value such as emotional anguish and loss of enjoyment of life. But the court must still have some basis for awarding damages or granting equitable relief. Mr. Dingus has given the court nothing to support his damage claims nor his claim for equitable relief. For that reason, the court awards Mr. Dingus nominal damages of $1.00.

SO ORDERED this 19th day of June, 2015.

BY THE COURT:

*Tena Campbell*
TENA CAMPBELL
U.S. District Court Judge