# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TENNESSEE
# AT KNOXVILLE

| | |
|---|---|
| DE'OSSIE DEON DINGUS,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>TENNESSEE DEPARTMENT OF SAFETY, et al.,<br><br>　　　　Defendants. | ORDER AND<br><br>MEMORANDUM DECISION<br><br><br><br>Case Nos. 3:07-CV-452, 3:10-CV-435<br><br>(Campbell/Shirley) |

On June 19, 2015, this court found, after a bench trial, that the Tennessee Department of Safety (Defendants or TDOS) discriminated against Plaintiff De'Ossie Dingus because of his religion (Mr. Dingus is a Sunni Muslim). (See Findings of Fact & Conclusions of Law, Docket No. 169 [hereinafter "[Discrimination Order"].) The court awarded him nominal damages in the amount of $1.

Mr. Dingus appealed the damages award to the Sixth Circuit Court of Appeals. In April 2016, the Sixth Circuit issued a decision vacating this court's judgment and remanding the case "for consideration of a more appropriate damages award" to compensate Mr. Dingus for his mental anguish and emotional distress. (Apr. 5, 2016 Order at 4-5, Docket No. 32-2 in Case No. 15-5745 (6th Cir.) [hereinafter "Remand Order"].) After remand, at this court's request, the parties briefed the issue of damages.[1]

---

[1] The court ordered Mr. Dingus to file a post-trial brief concerning damages. The court further ordered the Defendants to file a response brief. No other briefing was requested. But

For the reasons set forth below, the court awards Mr. Dingus $100,000 in compensatory damages.

## DISCUSSION

A plaintiff who prevails on a claim under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., is entitled to compensatory damages if he establishes that his employer's discriminatory conduct caused him emotional distress. (Remand Order at 4 (citing 42 U.S.C. § 1981a(a)(1); Turic v. Holland Hospitality, Inc., 85 F.3d 1211, 1214 (6th Cir. 1996)).) "A plaintiff's own testimony, along with the circumstances of a particular case, can suffice to sustain the plaintiff's burden." (Id.) "It is well settled that Title VII plaintiffs can prove emotional injury by testimony without medical support." Turic at 1215. But the plaintiff may not rely on a presumption of harm. Instead, the plaintiff must present "competent evidence" such as testimony of the plaintiff, other witnesses, and the circumstances of the case. Id. at 1216 (quoting Carey v. Piphus, 435 U.S. 247, 263–64 & n.20 (1978)).

For an overall description of the circumstances of the case, the court refers the reader to the Discrimination Order and the Remand Order. But the following evidence highlights the egregious circumstances[2] and the effect they had on Mr. Dingus.

---

after the parties filed the briefs requested by the court, Mr. Dingus filed an unsolicited reply to the Defendants' response. The Defendants moved to strike that reply. (See TDOS Mot. to Strike, Docket No. 226.) Although the court's order did not allow Mr. Dingus's supplemental brief, the court appreciates Mr. Dingus's clarification that he is not seeking an award of back pay from this court. The court will, however, disregard the remainder of Mr. Dingus's Reply (Docket No. 225). Accordingly, TDOS's Motion to Strike is GRANTED IN PART AND DENIED IN PART.

[2]The Sixth Circuit independently characterized TDOS's conduct as "egregious." (Remand Order at 4.)

2

When Mr. Dingus was hired in 2000 to work as an officer for TDOS, he attended a sixteen-week training academy. During training, he encountered problems as the result of his religious status and practices. And some people associated him with the Nation of Islam, which has a reputation for "extreme hatred for white people." (Nov. 17, 2014 Trial Tr. at 26, Docket No. 161 [hereinafter "Tr."].) Mr. Dingus testified that "to say the least, it was a little trying." (Id. at 22.)

> Q. How did it make, how did you feel at the academy for 16 weeks?
>
> A. Isolated.
>
> Q. Why?
>
> A. Well, I felt that when they found out that I was Muslim that things began to change drastically. When you are told that you cannot pray, if you do you will be in trouble, you are told that your special dietary needs aren't the Department's concern. You eat what everybody else eats. Being labeled as a black Muslim, that you don't like white people, that you can't bunk with white people, that you have trouble with white people. That you don't like Christianity, that the people who are around you, they are Christian and you make them feel uncomfortable. Things of that nature.

(Id. at 31.) After the academy, negative responses to his religious status did not end.

His supervisor gave him a less favorable post as a result of his religious practices and his status as a Sunni Muslim. He was mostly positioned on the westbound side of the scales (one of his duties was to weigh trucks) on the interstate highway ("[g]enerally just one officer worked the westbound side"[3]) because his supervisor said that Mr. Dingus "made the other officers feel uncomfortable." (Id. at 36.) During trial, he testified about his experience:

> THE COURT: What didn't you like about the westbound scales?

---

[3] Nov. 17, 2014 Trial Tr. at 34.

3

>     THE WITNESS: The isolation.
>
>     THE COURT: Even though you were very close to the eastbound scales, what do you mean by the isolation?
>
>     THE WITNESS: When I would come in most people were piling up on the eastbound side to work. Then I would be left over there to work by myself. Every now and then if I was working with Wilder or Edgar, Edgar, Wilder or Dale Shannon, they would come over and work every now and then with me.

(Id. at 127.)

He was asked to join in prayer meetings with Christian employees. When he declined, his supervisor later said that Mr. Dingus should have joined "because it would make the other officers feel comfortable, as though [he] was a part of the team" and that he "missed an opportunity to show that [he] liked white people[.]" (Id. at 39–40.) After he declined, he experienced "the isolation of feeling as though I was not part of the team." (Id. at 42.)

From August to November 2005, Mr. Dingus had to take a leave of absence from work due to a work-related injury. When he returned, TDOS required, as part of reinstatement to his original position, that he take and pass a psychological evaluation. The doctor found him psychologically unfit for the position and TDOS terminated Mr. Dingus in 2006. That decision was later reversed by a court, and he was reinstated in 2009, albeit in the driver's license bureau in an administrative position, where he "processed handgun permits, IDs, driver's license[s]. That is pretty much all I did on a day-to-day basis." (Id. at 53.) He was not allowed to carry any type of weapon or wear a uniform. "Because I was 'unfit' by the Department's standards, I couldn't carry a handgun. I couldn't be a commissioned officer. I could be an employee, but I could not be a commissioned officer, even though I had been put back to work by the Judge." (Id. at 59.) He wanted to maintain his status as a trooper.

4

> Q. When you were put back at driver's license you were put back at the same pay and benefits as you were before?
>
> A. Benefits, but not the status.
>
> Q. Okay. And the status being you couldn't carry a gun, weren't a commissioned officer?
>
> A. The gun issue wasn't a problem for me. Commission was a problem. I wanted my commission back. Even though I was told that I could not get my commission or get a cruiser or I couldn't wear the uniform. <u>What I had strode, me striving to be a trooper to me had been ripped away. I wanted my status back. Of course, the Department didn't want to give it to me.</u>
>
> . . . .
>
> [T]hey would not allow me to wear a uniform. I couldn't have an ID. Like I explained earlier, they gave me a . . . plain white piece of paper that says Department of Safety, has your name on it and that is really about it. It doesn't say you are commissioned. It says you are an employee. For that alone I thought, you know, I want my commission back. I want to be back where I feel most comfortable, what I am good at.

(Tr. at 128–29.)

In November 2009, he attended a required training seminar concerning weapons-of-mass-destruction. Major Kevin Taylor, who presented the seminar, showed the video "The Karachi Boys" (a film about the radicalization of young American boys "to extreme Islamic thoughts of hating America and training them to become terrorists."). (<u>Id.</u> at 61.) Major Taylor also talked about his military service in Afghanistan and his contact with people in Afghanistan, including combatants. After class, Mr. Dingus had a conversation with Major Taylor.

> I expressed to him that I thought that the information he put out was prejudice. I asked him why would he give a lecture on women being raped, the hygiene of the men, them being nasty how they use the restrooms in the street, asked him why would he put that information out to people that had not had a real familiarity with people who were Islamic and that I thought it set up a bad taste in people's mouths about how they would deal with people who were Islamic when they came

5

across them.

(Id. at 65-66.) Major Taylor's response was a bit agitated.

> He asked me why, he asked me why I was asking. I told him because I was Muslim. Then he, as coincidental as it may seem, he also said to me, "so you are one of those." I asked him "one of what?" He said, "You are one of those black Muslims." I said, well, "I am Muslim." He said, "well, have you been overseas to study?" I said, "I have never been overseas." He said, "Well, you know, if you have got a problem with the way that I have given out this information, why don't you contact me and let's sit down and talk about it." I said, "No, I don't need to contact you. I just wanted to let you know that I thought that the material that you put out was bad."

(Id. at 66.) Mr. Dingus expressed his opinion to Major Taylor because he was offended by Major Taylor's comments.

> Q. You felt like they disparaged your religion?
>
> A. I did. I felt like it went beyond the religion. In a certain part of him showing slides he talked about how it was common for women to be raped and it was okay. How it was common for them to be married off at 11 and 12 and it was okay. He talked about how the men, their hygiene was not adequate. How they would use the restroom in the middle of the street, how they go days without bathing. I thought that was disparaging to me as an American Muslim. I thought it was very inflammatory across the board to anybody who practices the religion of Islam.

(Id. at 87-88.)

TDOS later gave credence to Major Taylor's allegation that Mr. Dingus, by virtue of his religion, posed a threat to the safety of others in the TDOS. In a memorandum Major Taylor sent to TDOS, he said "I would like to reiterate my emergent concerns with Trooper Dingus' actions and my firm opinion that he has a potential for acting out in a violent manner within the workplace, if he viewed a challenge." (Discrimination Order at 16 (quoting Major Taylor's Nov. 8, 2009 Mem. to TDOS).) A TDOS representative later interviewed Major Taylor, and asked whether Major Taylor thought "there's the potential that [Mr. Dingus] could be turned by a

6

terrorist," and Major Taylor responded, "'Oh, yeah.'" (Id. at 12 (quoting tr. of Sergeant Ron Crockarell's interview of Major Taylor).)

Mr. Dingus was then subjected to a second psychological evaluation. In fact, two officers from the TDOS escorted him to the examination in a patrol car. Doctor Kenneth Anchor, Ph.D., issued an opinion that was based on invalid and biased information provided to him by the TDOS (including Major Taylor's view of Mr. Dingus). As this court found in its Discrimination Order:

> Approximately one month later, TDOS terminated Mr. Dingus's employment. In the termination memorandum he sent to Mr. Dingus, Commissioner Mitchell cited the alleged incident with Major Taylor and Dr. Anchor's report finding Mr. Dingus unfit for duty. (Ex. 35.)
>
> When Mr. Dingus was given his termination documents, he found stapled to the documents a newspaper article with the headline: "Handling of Ft. Hood shooting suspect could bring discipline." (Ex. D to Ex. 28.) The article outlined the alleged failure of the accused Ft. Hood gunman's supervisors to take "corrective action" when he failed to meet "basic officer standard." (Id.; see also Tr. at 76-78, 117-20.)

(Id. at 14.) The court concluded that "the TDOS was, in the court[']s view all too eager to accept Major Taylor's belief that because Mr. Dingus was a Muslim, he was dangerous." (Id. at 17.) The Ft. Hood article remained in Mr. Dingus's permanent personnel file. (See Tr. at 118.)

During questioning at trial, Mr. Dingus described how he felt when these events occurred.

Q. Are you a terrorist, Mr. Dingus?

A. I am not.

. . . .

Q. . . . [H]ow [did you feel] about someone who had been to Afghanistan saying that you, De'Ossie Dingus, had terrorist characteristics.

A. Well, I can say this. To have 35 people say something didn't happen and have one man overwhelmingly say because he has traits or he looks like something I

7

have seen somewhere is really disheartening. The process didn't work. To have
my termination papers sent to me and have an article attached to it suggesting that
for the good of service we'll stop you before something happens, doesn't work for
me. The idea behind it is disheartening and it hasn't been an easy thing.

Q. Let me ask my question a different way. When you were terminated -- you
have been terminated twice from the Department of Safety.

A. Yes.

Q. Did you lose your salary?[4]

A. I did.

Q. Did you lose your benefits?

A. I did.

Q. What benefits?

A. No health, no dental, no eye, no life insurance.

Q. Those are benefits that are provided to you?

A. To me as an employee of the state.

Q. Okay. So during all this time when Mr. Burks was initiating these
administrative appeals on your behalf; the first and second termination, you were
going without salary?

A. Yes.

THE COURT: How long did you go without salary?

THE WITNESS: The first termination was from May 22nd, 2006, until the
reinstatement in August of 2009, about three years. The second one was from
February of 2010 until I went back to the court which was I believe in April or
May of 2013.

---

[4]Mr. Dingus received all back pay and benefits that he lost. (See Tr. at 85 ll. 14–18.) The court's award of damages does not include those numbers.

8

BY MR. KNIGHT:

Q. Did you have bills during this, these two termination periods?

A. Mortgage, child support, car notes, insurance.

Q. Did you rely on your salary to take care of these types of things?

A. I did.

(Id. at 79–82.) TDOS's January 2010 termination of Mr. Dingus ended his twelve-year career with the State of Tennessee, including his ten-year career as a safety officer.

Courts have not provided any mathematical formula for calculating damages arising out of a plaintiff's "emotional distress, mental anguish, and loss of enjoyment of life," as the Sixth Circuit characterized Mr. Dingus's claim. (See Remand Order at 1.) The parties in their briefs do not suggest a particular amount, although earlier Mr. Dingus requested $300,000 in compensatory damages. The court finds that $100,000 is appropriate under the circumstances.

Mr. Dingus testified that he felt isolated and disheartened by his trying experience. He was deprived of the trooper status for which he had trained and qualified. He testified that TDOS

> would not allow me to wear a uniform. I couldn't have an ID. Like I explained earlier, they gave me a Department of Safety -- it's just a plain white piece of paper that says Department of Safety, has your name on it and that is really about it. It doesn't say you are commissioned. It says you are an employee. For that alone I thought, you know, I want my commission back. <u>I want to be back where I feel most comfortable, what I am good at</u>.

(Tr. at 128–29 (emphasis added).) Instead, what he had worked for "had been ripped away." (Id. at 128.)

He was treated as a threat. He was labeled as a possible terrorist-in-the-making. He was subjected to humiliating circumstances. All because he is a Sunni Muslim.

9

**ORDER**

For the foregoing reasons, the court awards $100,000 in compensatory damages to Mr. Dingus. The Defendants' Motion to Strike (Docket No. 226) is granted in part and denied in part. See supra n.1.

SO ORDERED this 20th day of September, 2016.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
U.S. District Court Judge